UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

THOMAS BIEDERMANN,

    Plaintiff,

  v.

REPRESENTATIVE GINNY
EHRHART, in her individual and
official capacities,

    Defendant.

CIVIL ACTION NO.
1:20-CV-01388-JPB

## **ORDER**

This matter comes before the Court on Thomas Biedermann's ("Plaintiff")

Motion for Preliminary Injunction [Doc. 2] and Second Brief in Support of

Preliminary Injunction [Doc. 35]. The Court finds as follows:

## **BACKGROUND**

Plaintiff is a resident of Fulton County, Georgia; Representative Ginny

Ehrhart ("Defendant") is a representative in the Georgia State House of

Representatives. [Doc. 1, pp. 3–4]. Plaintiff engages in public debate via social

media platforms and uses the pseudonym "Tom Alfred" when he uses Facebook.

Id. at 2. Defendant maintains an official Facebook page, "@GinnyEhrhartForGA,"

("the official Facebook page"), which she created in December 2017, as well as a

personal Facebook page ("the personal Facebook page"). Id. at 3, 5; see also [Doc.

11-1, p. 3].  The official Facebook page identifies Defendant as a state

representative, lists her affiliation with the Republican Party and her status as a

"Political Candidate," describes her political views and provides Defendant's state

representative contact information.  [Doc. 1, p. 4].  Defendant documents her

legislative and public activities on the official Facebook page by posting about

legislation at the Georgia State House of Representatives, promoting political

issues relevant to her constituency and updating citizens about her official

activities.  Id.  The official Facebook page also has an interactive component,

which includes posts by other Facebook users "engaging in public debate on

matters of public concern," particularly Defendant's legislative proposals and

political opinions.  Id. at 5.  Defendant maintains the official Facebook page and

encourages citizens to post comments on public issues and to use the platform to

communicate directly with her office.  Id. at 4–5.  Defendant also engages with

other users on the official Facebook page by "liking" comments in support or

praise of her legislative and political activities.  Id. at 5.

On October 30, 2019, Defendant posted a press release to the official

Facebook page about her proposed bill to criminalize certain surgeries performed

on transgender children.  Id. at 6.  Plaintiff wrote a disapproving comment on that

post, and his comment was deleted.  Id. at 7.  Plaintiff posted multiple comments

on the official Facebook page in the following days, but those comments were also deleted.  Id.  Plaintiff alleges that because Defendant disagreed with Plaintiff's political views, Defendant blocked him from posting on the official Facebook page or from engaging through other means, such as commenting on posts or using Facebook's reaction feature.  Id. at 6.

It is undisputed that Defendant removes content that she finds objectionable from the official Facebook page to tailor the page to convey a specific image and message to the public.  [Doc. 11-1, pp. 4–5].  Defendant utilizes Facebook's filtering features and claims that comments on the official Facebook page are deleted for containing "profanity, dishonesty, personal character attacks, or cyber stalking" and that posts are deleted when they violate her community standards policy regarding social media usage.  Id.; [Doc. 1, pp. 8–9].  The official Facebook page does not provide any written policy about the public's engagement with the page or about participation in discussions on Defendant's social media platforms. [Doc. 1, p. 9].  Nevertheless, Plaintiff alleges that he never made threatening posts and never posted comments of a defamatory, pornographic, obscene or violent nature.  Id.

There are over sixty users who have been blocked by Defendant, including political opponents who publicly raised the issue of Defendant's social media

blocking.  Id. at 9–10; [Doc. 1-1, pp. 13–14].  Some of the citizens who were

blocked by Defendant on social media have congregated in a group called

"#BlockedByGinny."  [Doc. 1, pp. 9–10].  On November 10, 2019, Plaintiff sent

an email to Representative Randy Nix of the Georgia State House of

Representatives seeking information about the ethics considerations or rules in

place addressing representatives' ability to block or remove posts containing

opposing views from their official social media accounts.  Id. at 7.  See also, [Doc.

1-1, p. 6].  Plaintiff's email specifically raised concerns about infringement on First

Amendment rights.  [Doc. 1-1, pp. 6–7].  In response, Representative Nix stated

that he "[did] not believe that such activities would be covered under the current

provisions," and "[t]he present provisions do not appear to address the concerns

that [Plaintiff] raise[d]."  Id. at 6; [Doc. 1, p. 7].  More than three years later,

Plaintiff continues to be blocked from posting, commenting, liking content or

otherwise engaging on the official Facebook page.  [Doc. 1, p. 9].

## PROCEDURAL HISTORY

Plaintiff filed this action on March 30, 2020.  [Doc. 1].  He simultaneously

filed a Motion for Preliminary Injunction but did not request an immediate hearing

on that motion.  [Doc. 1]; [Doc. 2, p. 2].  In the Complaint, Plaintiff brought two

counts under 42 U.S.C. § 1983:  (1) retaliation for exercise of free expression

under the First Amendment to the United States Constitution, against Defendant in her individual capacity ("Count One"), and (2) violation of Plaintiff's right to free speech under the First and Fourteenth Amendments, against Defendant in her individual and official capacities ("Count Two"). [Doc. 1]. Plaintiff also seeks declaratory and injunctive relief against Defendant in her official capacity under 28 U.S.C. § 2201 ("Count Three"). Id.

Defendant subsequently moved to dismiss the action on June 22, 2020. [Doc. 10]. The Court denied that motion for failure to comply with the Local Rules of this Court on March 19, 2021, but permitted Defendant to renew the motion. [Doc. 28]. The Court also deferred ruling on the instant Motion for Preliminary Injunction pending a resolution of the Motion to Dismiss. Id. at 4. Defendant renewed the Motion to Dismiss on April 1, 2021. [Doc. 29]. On March 14, 2022, the Court dismissed Counts One and Two of the Complaint against Defendant in her individual capacity on qualified immunity grounds. [Doc. 32]. Because Defendant's Motion to Dismiss did not raise any arguments for the dismissal of the official capacity claims, the Court allowed Count Two (solely against Defendant in her official capacity) and Count Three to proceed. Id. The Court then entered a briefing schedule for the pending Motion for Preliminary Injunction. See April 14, 2022 Docket Entry.

Defendant filed a Second Brief in Support of Preliminary Injunction on

April 28, 2022. [Doc. 35]. Specifically, Plaintiff argues that he is entitled to an

injunction

> requiring Defendant to cease her (1) unlawful and standard-less
> practice of deleting Plaintiff's comments, "likes," or other expressive
> activity; (2) blocking Plaintiff on State Representative Ehrhart's
> Facebook page on the basis of the viewpoint and in violation of the
> First and Fourteenth Amendments; and[] (3) compelling Defendant to
> rescind her ban on Plaintiff participating in discussion on State
> Representative Ehrhart's official Facebook page.

Id. at 1.

In response, Defendant contends that Plaintiff failed to meet any of the

requirements for granting a preliminary injunction and thus Plaintiff is not

entitled to injunctive relief.

## ANALYSIS

### A.   Legal Standard

A plaintiff seeking preliminary injunctive relief must show the following:

> (1) a substantial likelihood that he will ultimately prevail on the
> merits; (2) that he will suffer irreparable injury unless the injunction
> issues; (3) that the threatened injury to the movant outweighs
> whatever damage the proposed injunction may cause to the opposing
> party; and (4) that the injunction, if issued, would not be adverse to
> the public interest.

Sofarelli v. Pinellas County, 931 F.2d 718, 723–24 (11th Cir. 1991) (quoting

United States v. Jefferson County, 720 F.2d 1511, 1519 (11th Cir. 1983)). "[A]

preliminary injunction is an extraordinary and drastic remedy not to be granted unless the movant clearly establish[es] the burden of persuasion as to each of the four prerequisites." Siegel v. LePore, 234 F.3d 1163, 1176 (11th Cir. 2000) (internal punctuation omitted) (quoting McDonald's Corp. v. Robertson, 147 F.3d 1301, 1306 (11th Cir. 1998)). Granting a preliminary injunction is thus the exception rather than the rule. See id.

**B.     Substantial Likelihood of Success on the Merits**

A plaintiff seeking preliminary injunctive relief must show a substantial likelihood that he will ultimately prevail on the merits of his claim. Sofarelli, 931 F.2d at 723. This factor is generally considered the most important of the four factors, see Garcia-Mir v. Meese, 781 F.2d 1450, 1453 (11th Cir. 1986), and failure to satisfy this burden—as with any of the other prerequisites—is fatal to the claim, see Siegel, 234 F.3d at 1176. To meet this requirement, the Court does not need to find that Plaintiff has demonstrated a substantial likelihood of success on every claim in his Complaint. Atlanta Sch. of Kayaking, Inc. v. Douglasville-Douglas Cnty. Water & Sewer Auth., 981 F. Supp. 1469, 1472 (N.D. Ga. 1997). Rather, it is sufficient for Plaintiff to establish "a substantial likelihood of success on at least one claim or theory which in turn would support a preliminary injunction." Id.

The Court will first analyze Plaintiff's likelihood of success on the merits as to his § 1983 claim asserted against Defendant in her official capacity.  Generally, the requirements of a § 1983 claim are "(1) the conduct complained of was conducted by someone acting under the color of state law, and (2) the conduct deprived [the plaintiff] of legally recognized or Constitutional rights, privileges, or immunities."  Hall v. Tallie, 597 F. App'x 1042, 1044 (11th Cir. 2015).  Where, as here, a § 1983 claim is brought against a government official in her official capacity, the plaintiff must also establish a connection between a governmental policy or practice and the alleged actions that created the constitutional deprivation.  See Charudattan v. Darnell, 834 F. App'x 477, 481 (11th Cir. 2020).  Therefore, to succeed on his claim, Plaintiff must show that (1) Defendant's office had a policy or practice regarding the banning and removal of Facebook posts that contravened the First Amendment, and (2) this policy or practice was the moving force behind Plaintiff's alleged constitutional violation.  See id. at 479–80.  The Court will analyze Plaintiff's likelihood of success on the merits on the § 1983 claim based on the facts set forth by the parties.

### 1.  Action Under Color of State Law

A public employee acts under the color of state law "while acting in [her] official capacity or while exercising [her] responsibilities pursuant to state law."

West v. Atkins, 487 U.S. 42, 50 (1988).  Even where there is not a clear distinction

between public and private activity, "state action may be found if . . . there is such

a 'close nexus between the State and the challenged action' that seemingly private

behavior 'may be fairly treated as that of the State itself.'"  Charudattan, 834 F.

App'x at 481 (quoting Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n,

531 U.S. 288, 295 (2001)).  Particularly relevant here, the Eleventh Circuit Court

of Appeals has recognized that a state representative can act in her official capacity

when operating social media accounts as an extension of her role in state office.

See Attwood v. Clemons, 818 F. App'x 863, 867 (11th Cir. 2020).[1]

Attwood concerned § 1983 claims brought against a state representative for

blocking a constituent from his official social media accounts.  Id. at 865–66.  The

district court denied the state representative's motion to dismiss, finding that he

---

[1] Several other circuit courts agree.  See Garnier v. O'Connor-Ratcliff, 41 F.4th 1158,
1170 (9th Cir. 2022) (finding that trustees were acting under the color of state law when
they blocked constituents from their official social media accounts); Campbell v. Reish,
986 F.3d 822, 826 (8th Cir. 2021) (recognizing that a private social media account can
become governmental in nature if it is used as an "organ of official business" but
ultimately concluding that the record did not support a finding of action under color of
law); Knight First Amend. Inst. at Columbia Univ. v. Trump, 928 F.3d 226, 236 (2d Cir.
2019), cert. granted, vacated as moot sub nom. Biden v. Knight First Amend. Inst. at
Columbia Univ., 141 S. Ct. 1220 (2021) (finding that use of the blocking function on a
government official's social media account constituted government action); Davison v.
Randall, 912 F.3d 666, 680 (4th Cir. 2019) (finding that a government official acted
under the color of state law in creating, administering and blocking a member of the
public from an official Facebook page).

was not entitled to absolute immunity or immunity under the Eleventh

Amendment, and the representative appealed.  Id. at 865.  The case was thus before

the Eleventh Circuit on an interlocutory appeal to determine whether immunity

was properly denied.  Id. at 867.  The plaintiff alleged that the state representative

was acting in his official capacity when operating his social media accounts.  Id.

The Eleventh Circuit agreed and concluded that the plaintiff's allegations indicated

official action where the state representative "adorn[ed] his social media accounts

with all the trappings of his state office" and "use[d] the accounts to make official

statements, to share information about legislative activities and government

functions, and to communicate with the general public."  Id.  The social media

accounts in Attwood also provided the state representative's official contact

information to facilitate connections with his social media followers.  Id.  Although

Attwood was not ultimately evaluated on the merits, the Court nevertheless finds

that the case provides insight on the types of facts that are consistent with finding

action under color of state law in the context of social media use.

Charudattan was another case before the Eleventh Circuit that involved §

1983 claims relating to a government official's use of a social media page.  834 F.

App'x at 478.  In Charudattan, the plaintiff appealed the district court's order

granting summary judgment to the defendant.  Id.  The Eleventh Circuit affirmed

the district court's finding that a county sheriff's campaign Facebook page was

private rather than official where the sheriff

> created and administered the page for her private reelection campaign;
> the page did not include her official title at the time of the alleged
> unconstitutional action; the page did not contain posts on behalf of the
> Sheriff's Office; and the page was not categorized as belonging to a
> "government official."

Id. at 482.

Here, the facts set forth by the parties indicate that Defendant maintains both

an official Facebook page in her official capacity as a state representative and a

personal Facebook page.  [Doc. 1, pp. 3, 5].  The official Facebook page identifies

Defendant as a state representative, describes her political affiliation and views and

provides her official state representative contact information.  Id. at 4.  Defendant

uses the official Facebook page to keep her constituents informed about her official

activities and to promote political viewpoints and matters of concern to her

constituency.  Id.; see also [Doc. 11-1, p. 4].

The Court finds that there is a substantial likelihood that Plaintiff can show

Defendant's use of the official Facebook page is closely tied to her position as a

state representative.  Defendant's use of the official Facebook page closely

resembles that of the representative in Attwood because it bears the "trappings" of

her state office and is used to connect and communicate with her constituents and

members of the general public.  In contrast, the official Facebook page lacks the

qualities that the Eleventh Circuit found indicative of private, rather than official,

use in <u>Charudattan</u>.  Here, Defendant uses the official Facebook page in

furtherance of her work as state representative, rather than for private campaign

purposes.  Therefore, there is a substantial likelihood that Plaintiff will

successfully show that Defendant was acting under the color of state law in

operating the official Facebook page.  The Court next considers the likelihood that

Plaintiff will establish that Defendant's actions violated Plaintiff's constitutional

rights.

## 2.  Violation of a Constitutional Right

Plaintiff alleges that Defendant infringed on his freedom of speech and

expression when Defendant banned him and removed his comments from the

official Facebook page.  [Doc. 1, p. 12].  Specifically, Plaintiff contends that

Defendant's actions impose viewpoint-based restrictions on his participation in a

designated or limited public forum.  [Doc. 35].  Plaintiff argues that Defendant's

actions also amount to an exercise of unbridled discretion and a prior restraint on

speech.  <u>Id.</u>  The Court begins its analysis with a brief overview of the available

First Amendment protections.

The First Amendment prohibits government action that abridges the freedom of speech.  U.S. Const. amend. I.  "At the heart of the First Amendment lies the principle that each person should decide for himself or herself the ideas and beliefs deserving of expression, consideration, and adherence."  Turner Broad. Sys., Inc. v. FCC, 512 U.S. 622, 641 (1994).  Therefore, the government typically "has no power to restrict expression because of its message, its ideas, its subject matter, or its content."  Reed v. Town of Gilbert, 576 U.S. 155, 163 (2015) (quoting Police Dep't of Chi. v. Mosley, 408 U.S. 92, 95 (1972)).

The Supreme Court of the United States has established that "[a] fundamental principle of the First Amendment is that all persons have access to places where they can speak and listen" and has recognized that in the modern era, social media websites provide "perhaps the most powerful mechanisms available to a private citizen to make his or her voice heard."  Packingham v. North Carolina, 137 S. Ct. 1730, 1735, 1737 (2017).  Accordingly, social media is subject to the same First Amendment protections as other forms of media.  Id.

At issue in this case is Defendant's alleged infringement on Plaintiff's freedom of speech, namely political speech,[2] which is a category of speech

---

[2] The Supreme Court has found that "interactive communication concerning political change . . . is appropriately described as 'core political speech.'"  Meyer v. Grant, 486 U.S. 414, 422 (1988).  The Supreme Court's First Amendment jurisprudence defines

protected under the First Amendment.[3]  However, "even protected speech is not

equally permissible in all places and at all times," and "the extent to which the

Government can control access [to a forum for speech] depends on the nature of

the relevant forum."  Cornelius v. NAACP Legal Def. & Educ. Fund, Inc., 473

U.S. 788, 799–800 (1985).  To determine the likelihood of Plaintiff showing that

Defendant violated his constitutional rights, the Court first considers whether the

official Facebook page is a public or nonpublic forum and then evaluates whether

Defendant's deleting Plaintiff's comments and banning Plaintiff constitute

viewpoint discrimination.

### i.  Social Media Forum Analysis

It is well-established that the extent to which the government may impose

restrictions on protected speech is dependent on whether the forum of speech is

public or nonpublic.  Cornelius, 473 U.S. at 800.  Under this "forum based"

---

"core political speech" as the discussion of public issues and the exchange of ideas for
bringing about political and social change, and the Supreme Court reserves the highest
level of protection for such speech.  See McIntyre v. Ohio Elections Comm'n, 514 U.S.
334, 346 (1995).  The Court finds that Plaintiff's Facebook comments expressing
disapproval of Defendant's proposed bill fall under the category of political speech.

[3] The First Amendment protects several categories of speech and expression, and the
Supreme Court's decisions in this area have created a "rough hierarchy" of available
protections.  R.A.V. v. City of St. Paul, 505 U.S. 377, 422 (1992) (Stevens, J.,
concurring).  "Core political speech occupies the highest, most protected position" in the
hierarchy, while obscenity and fighting words receive the least protection.  See id.

approach, the government's regulation of speech is scrutinized based on a hierarchy of protections afforded to different categories of fora.  See Pleasant Grove City v. Summum, 555 U.S. 460, 469 (2009).

The Supreme Court has distinguished three types of fora:  the traditional public forum, the designated public forum and the nonpublic forum.  Cornelius, 473 U.S. at 802 (citing Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n, 460 U.S. 37, 45 (1983)).  Traditional public fora are places that have traditionally been devoted to assembly and debate, such as public streets and parks.  Id.  Designated public fora are places or channels of communication created by government designation for use by the public at large for assembly and speech, which the government can limit to use by certain speakers or for the discussion of certain subjects.  Id.  By contrast, a nonpublic forum is "a space that 'is not by tradition or designation a forum for public communication.'"  Minn. Voters All. v. Mansky, 138 S. Ct. 1876, 1885 (2018) (quoting Perry, 460 U.S. at 46).

Although the implications of social media on First Amendment forum analysis is still a developing area of law, several courts have concluded that social media websites are a type of public forum.  See, e.g., Garnier v. O'Connor-Ratcliff, 41 F.4th 1158, 1178–79 (9th Cir. 2022) (noting that social media websites "are fora inherently compatible with expressive activity" and finding that

government officials' social media pages were designated public fora where they were open and available to the public without any restriction on the form or content of comments); Knight First Amend. Inst. at Columbia Univ. v. Trump, 928 F.3d 226, 237 (2d Cir. 2019), cert. granted, vacated as moot sub nom. Biden v. Knight First Amend. Inst. at Columbia Univ., 141 S. Ct. 1220 (2021) (finding that a government official's social media account was a public forum where the account was intentionally opened for public discussion, was used as an official vehicle for governance and made its interactive features accessible to the public without limitation);[4] Davison v. Randall, 912 F.3d 666, 682 (4th Cir. 2019) (holding that a government official's Facebook page was a public forum where it bore "the hallmarks of a public forum," such as unrestricted public access, and was "compatib[le] with expressive activity" by inviting a public exchange of views).

Plaintiff argues that the official Facebook page is either a designated public forum or a limited public forum because it contains an interactive section that allows for speech by citizens. [Doc. 38, pp. 10, 13]. On the other hand, Defendant contends that the official Facebook page is not subject to forum analysis because

---

[4] Although the Supreme Court vacated the Second Circuit Court of Appeals' decision as moot, the Court finds the Second Circuit's reasoning persuasive. See Friends of the Everglades v. S. Fla. Water Mgmt. Dist., 570 F.3d 1210, 1218 (11th Cir. 2009) (noting that courts are free to give statements in a vacated opinion persuasive value).

Facebook is privately owned and is not a "government-controlled space." [Doc. 37, pp. 8–9]. Defendant also argues that she operates the official Facebook page as a "modern newsletter," and therefore the official Facebook page is government speech that falls outside the realm of the First Amendment. Id. at 11–13.

Existing authority from other courts rejects arguments similar to those set forth by Defendant. For instance, in Davison, the Fourth Circuit Court of Appeals analyzed Supreme Court precedent related to private property categorized as public fora and noted that "the Supreme Court never has circumscribed forum analysis solely to government-owned property." 912 F.3d at 682–83. The Fourth Circuit declined to draw "such arbitrary lines," id. at 685, and instead focused on the facts indicating that the government official, acting under color of state law, retained and exercised significant control over the page, id. at 683. According to the Davison court, the government official's control was evident because she created the Facebook page, designated the page as belonging to a "government official" and "clothed the page in the trappings of her public office." Id. The Fourth Circuit concluded that, even assuming the Facebook page constituted private property, the government official's significant control over the Facebook page supported the application of a public forum analysis. Id. at 683, 685.

Here, the facts similarly demonstrate that the official Facebook page was adorned with the "trappings" of Defendant's state office and was used in furtherance of Defendant's work as a government official.  Further, the official Facebook page was open to the public and at the very least, the interactive component of the official Facebook page invited a public exchange of views. Defendant contends that Facebook, a private party, retains unbridled control of the official Facebook page.  [Doc. 37, pp. 10–11].  However, Defendant contradictorily concedes that she has "broad authority" to moderate the official Facebook page, which is consistent with finding that the page is a public forum. Id. at 22.  The Court is not convinced the official Facebook page is not subject to forum analysis simply because Facebook is privately owned.

As to Defendant's government speech argument, the Fourth Circuit in Davison also rejected this theory.  912 F.3d at 686.  The Fourth Circuit reasoned that the public, interactive comment section of the Facebook page could not be mistaken for the government official's own speech, even if other parts of the page were considered government speech.  Id.; see also Knight First Amend. Inst., 928 F.3d at 239 (distinguishing the interactive feature of a social media page as non-government speech and thus a public forum).

Of particular significance here, the official Facebook page includes an interactive section open to other users to post comments and engage in public debate on matters of public concern, including political debate.  [Doc. 1, p. 5]. Although Defendant plausibly contends that her own posts and the messages she conveys on the official Facebook page are government speech not subject to First Amendment regulation, the Court does not agree that it should extend the boundaries of "government speech" to also encompass speech by other users and members of the public.  See Knight First Amend. Inst., 928 F.3d at 239 (noting that "the speech in question is that of multiple individuals, not just . . . that of the government" and finding that although a government official's posts can be government speech, speech by other users in response is not government speech). To further support her government speech argument, Defendant contends that she controlled the content of the official Facebook page by implementing filtering features and moderating objectionable content that she did not endorse.  [Doc. 37, p. 5].  Ultimately, the Court finds that Defendant's implementation of word filters or "community guidelines" does not negate the fact that the official Facebook page, and the interactive section in particular, were open to the public for access and engagement.

Therefore, the Court concludes that there is a substantial likelihood that Plaintiff will establish that the official Facebook page is a designated or limited public forum.  Because Plaintiff alleges that Defendant engaged in viewpoint discrimination, the Court need not make a further determination to distinguish the type of public forum.  See Pleasant Grove, 555 U.S. at 469–70 (noting that viewpoint discrimination is prohibited in both designated and limited public forums).

## ii.  Viewpoint Discrimination

Having determined that there is a substantial likelihood that Plaintiff can show the official Facebook page is a public forum, the Court next evaluates the likelihood that Plaintiff can establish that Defendant engaged in viewpoint discrimination that contravened the First Amendment.

The First Amendment protects speech against two types of regulation: content-based discrimination and viewpoint discrimination.  Cambridge Christian Sch., Inc. v. Fla. High Sch. Athletic Ass'n, 942 F.3d 1215, 1240 (11th Cir. 2019) (quoting Reed v. Town of Gilbert, 576 U.S. 155, 168 (2015)).  Content-based discrimination is the restriction of speech based on "the topic discussed or the idea or message expressed."  Id. (quoting Reed, 576 U.S. at 171).  Viewpoint

discrimination is a form of content-based discrimination that restricts speech based on the ideology, opinion or perspective of the speaker.  Id. at 1240–41.

When the government provides a public forum for speech, it cannot restrict speech or speakers from the forum on the basis of viewpoint.  Attwood v. Clemons, 818 F. App'x 863, 867 (11th Cir. 2020) (quoting Manhattan Cmty. Access Corp. v. Halleck, 139 S. Ct. 1921, 1930 (2019)).  This prohibition on viewpoint discrimination applies to all public fora—traditional, designated and limited.  See Bloedorn v. Grube, 631 F.3d 1218, 1231 (11th Cir. 2011).

As relevant here, "[v]iewpoint discrimination is apparent if a government official's decision to take a challenged action was 'impermissibly motivated by a desire to suppress a particular point of view.'"  Davison v. Randall, 912 F.3d 666, 687 (4th Cir. 2019) (quoting Cornelius v. NAACP Legal Def. & Educ. Fund, Inc., 473 U.S. 788, 812–13 (1985)).  In the context of social media, courts have found viewpoint discrimination where government officials deleted comments or blocked individuals from their social media pages to prevent them from expressing negative opinions or contrary views.  See Attwood, 818 F. App'x at 867 (noting that where a public official's social media pages are considered public fora, the official "may not be allowed to exclude others based on their views"); Knight First Amend. Inst. at Columbia Univ. v. Trump, 928 F.3d 226, 239 (2d Cir. 2019), cert. granted,

vacated as moot sub nom. Biden v. Knight First Amend. Inst. at Columbia Univ., 141 S. Ct. 1220 (2021) (finding viewpoint discrimination where a government official blocked the plaintiffs because of their disfavored speech); Robinson v. Hunt County, 921 F.3d 440, 447 (5th Cir. 2019) (finding viewpoint discrimination where government officials deleted the plaintiff's Facebook comment and banned her from their Facebook page, regardless of whether the government officials were motivated by the plaintiff's criticism of their office or by a determination that her comment was otherwise "inappropriate"); Davison, 912 F.3d at 687 (finding "black-letter viewpoint discrimination" where a government official banned the plaintiff from her Facebook page based on the plaintiff's comments alleging corruption).

Plaintiff contends that he engaged with the official Facebook page by viewing comments and replying to Defendant's posts. [Doc. 35, p. 4]. Specifically, Plaintiff posted disapproving comments in response to Defendant's posts about a legislative priority, and his comments were subsequently deleted. [Doc. 1, p. 7]. Thereafter, Defendant blocked Plaintiff from the official Facebook page, thus restricting him from posting, liking, commenting or otherwise engaging with the official Facebook page. Id. at 6. Plaintiff alleges that Defendant's actions were based on political disagreement with the viewpoint of the messages Plaintiff

posted, and he maintains that his posts never contained any threatening, defamatory, pornographic, obscene or inciting speech. Id. at 6, 9. Defendant's viewpoint discrimination, Plaintiff argues, is further made apparent by the fact that Defendant blocked or deleted comments by several other individuals with opposing viewpoints and scrubbed the official Facebook page to remove contrary opinions, thus leaving only those viewpoints that align with Defendant's. Id. at 9–11. The facts set forth by Defendant do not contradict those set forth by Plaintiff. Defendant concedes that she periodically removed from the official Facebook page objectionable content that did not align with the image or message that she wished to convey to the public. [Doc. 37, p. 26].

The facts presented by the parties are consistent with a finding that Defendant removed Plaintiff's comments and blocked Plaintiff from engaging with the official Facebook page because the views Plaintiff expressed did not align with Defendant's views. Therefore, the Court finds that there is a substantial likelihood that Plaintiff will establish that Defendant's actions constituted viewpoint discrimination in a public forum in violation of Plaintiff's First Amendment right to freedom of speech and expression.[5]

_____

[5] Having found there is a substantial likelihood that Plaintiff can show a constitutional violation by Defendant, the Court will not analyze Plaintiff's additional arguments regarding unbridled discretion or prior restraint.

### 3.  Connection to Governmental Policy or Practice

Plaintiff's § 1983 claim is brought against Defendant in her official capacity. Although the parties have not briefed this requirement, the Court must analyze whether Plaintiff can establish a connection between a policy or practice of Defendant's office and the alleged constitutional violation in evaluating the likelihood of success on the merits.  See Charudattan v. Darnell, 834 F. App'x 477, 481 (11th Cir. 2020).  This additional requirement stems from the principles that official capacity suits against state officials are treated as suits against the official's office, not the official themselves, and that a government entity is not liable for its employee's actions under § 1983 on the theory of *respondeat superior*. Charudattan, 834 F. App'x at 480 (citing Monell v. N.Y.C. Dep't of Soc. Servs., 436 U.S. 658, 691 (1978); Attwood v. Clemons, 818 Fed App'x 863, 871 (11th Cir. 2020) (Grant, J., concurring in part).  Rather, a government entity may be held liable for its employee's unconstitutional actions only if such actions result from a governmental policy or a custom that is "so well-settled and pervasive that it assumes the force of law."  Denno v. Sch. Bd. of Volusia Cnty., 218 F.3d 1267, 1277 (11th Cir. 2000).

### i.  Final Policymaking Authority

The Court first considers whether the Georgia State House of Representatives had an official policy that caused Defendant's violation of Plaintiff's constitutional rights.  Where the government entity itself does not have a policy addressing the actions that give rise to a constitutional violation, the policy of a government official can nevertheless be deemed representative of the government entity if the acting official is "imbued with final policymaking authority."  See id. at 1276.  However, the mere delegation of authority to exercise discretion is not sufficient to establish policymaking authority.  Brown v. Neumann, 188 F.3d 1289, 1290 (11th Cir. 1999) (citing Mandel v. Doe, 888 F.2d 783, 792 (11th Cir. 1989)).  Rather, the delegation must rise to a level where the discretionary decisions are not constrained by official policies and are not subject to review.  Id.  In other words, in the context of this case, the Georgia State House of Representatives can be held liable for Defendant's social media policies (which likely infringed on Plaintiff's constitutional rights) if Defendant had the final authority to implement those policies.  Brown v. City of Fort Lauderdale, 923 F.2d 1474, 1480 (11th Cir. 1991).

Here, the Georgia State House of Representatives does not have an official policy addressing state representatives' moderation of their official social media

pages, but Defendant has implemented her own policies for deleting or blocking objectionable content on the official Facebook page.  See [Doc. 1-1, p. 6]; [Doc. 37, p. 21].  Although Plaintiff does not provide facts supporting a finding that Defendant was "imbued with final policymaking authority," Defendant contends that she exercises "final authority over the content of her Facebook page," and the content on the official Facebook page "carries the imprimatur of her office."  [Doc. 37, pp. 21–22].

The Court finds that the facts provided by Defendant describing her "broad authority" to moderate the official Facebook page indicate that, at the very least, Defendant exercised discretion with respect to moderating the official Facebook page.  [Doc. 37, p. 22].  However, as noted above, the mere delegation of discretion is not sufficient to demonstrate delegation of final policymaking authority.  See Neumann, 188 F.3d at 1290.  Based on this standard, the facts presented by the parties do not adequately support a finding that Plaintiff is substantially likely to establish that Defendant was imbued with final policymaking authority that was not subject to review by the Georgia State House of Representatives.  To the contrary, the email Plaintiff received from Representative Nix, which confirmed that Defendant's social media activities were not covered under the "current provisions" of the state legislature's rules and laws,

may indicate that the Georgia State House of Representatives retains the authority to establish an official policy regarding state representatives' social media use in the future.  <u>See</u> [Doc. 1, p. 7]; [Doc. 1-1, p. 6].  Because it is not clear that the Georgia House of Representatives delegated final policymaking authority to Defendant to moderate the official Facebook page, the Court next evaluates whether there is a governmental custom or practice on this issue.  <u>Denno</u>, 218 F.3d at 1277.

### i.    Custom or Practice

Even assuming that the Georgia State House of Representatives retained authority to establish a policy with respect to state representatives' social media use, the Court finds that Plaintiff is substantially likely to show a connection between the constitutional violation and Defendant's office by demonstrating that Defendant's actions constituted a custom or practice "so well-settled and pervasive that it assume[d] the force of law."  <u>Denno</u>, 218 F.3d at 1277.  To meet this requirement, Plaintiff must show that Defendant's unconstitutional social media practices were "persistent and widespread" rather than merely "isolated incidents" of which the Georgia State House of Representatives had knowledge or constructive knowledge.  <u>See</u> <u>id.</u>

Here, the facts provided by the parties fit squarely into the requirements for establishing a connection between the constitutional violation and Defendant's office based on custom or practice.  Defendant concedes that her removal of objectionable content from the official Facebook page is a "common practice," as further made evident by the "#BlockedByGinny" group, which consists of members of the public with opposing views who, like Plaintiff, were also blocked by Defendant.  [Doc. 37, pp. 21–22]; [Doc. 1, pp. 9–10].  Plaintiff also demonstrates that Defendant's practice of banning users or deleting comments based on viewpoint discrimination is "well-settled and pervasive," rather than "isolated":  Plaintiff pointed to sixty individuals who were blocked or had their posts deleted on the basis of viewpoint, including political opponents who publicly raised the issue of Defendant's blocking them on social media.  [Doc. 1, p. 10]; [Doc. 1-1, pp. 13–14].  Further, the Georgia State House of Representatives had knowledge or at least constructive knowledge about Defendant's practice of deleting comments or blocking individuals based on viewpoint, as demonstrated by Plaintiff's November 2019 email exchange with Representative Nix, in which Plaintiff raised concerns about infringement on his constitutional rights stemming from Defendant's practices in moderating the official Facebook page.  [Doc. 1, p. 7]; [Doc. 1-1, pp. 6–7].

Based on the facts provided by the parties, the Court finds that Plaintiff is substantially likely to establish a connection between Defendant's office and the constitutional violation.  Accordingly, Plaintiff has demonstrated a substantial likelihood of success on the merits as to Count Two of his Complaint.  Because Plaintiff need only demonstrate a substantial likelihood of success on the merits as to one claim, see Atlanta Sch. of Kayaking, Inc. v. Douglasville-Douglas Cnty. Water & Sewer Auth., 981 F. Supp. 1469, 1472 (N.D. Ga. 1997), the Court will not analyze the likelihood of success on the merits as to Count Three of Plaintiff's Complaint.  Accordingly, Plaintiff has satisfied the first requirement for a preliminary injunction.

**C.      Substantial Threat of Irreparable Injury**

"A showing of irreparable injury is 'the sine qua non of injunctive relief.'" Siegel v. LePore, 234 F.3d 1163, 1176 (11th Cir. 2000) (quoting Ne. Fla. Chapter of Ass'n of Gen. Contractors v. City of Jacksonville, 896 F.2d 1283, 1285 (11th Cir. 1990)).  Even if a plaintiff can show a substantial likelihood of success on the merits, "the absence of a substantial likelihood of irreparable injury would, standing alone, make preliminary injunctive relief improper."  Id.; see also City of Jacksonville, 896 F.2d at 1285 (declining to address all elements of the preliminary injunction test because "no showing of irreparable injury was made").

The irreparable injury sufficient to satisfy the burden "must be neither remote nor speculative, but actual and imminent." Siegel, 234 F.3d at 1176 (quoting City of Jacksonville, 896 F.2d at 1285).  In the context of constitutional claims, it is well-settled that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." Elrod v. Burns, 427 U.S. 347, 373 (1976); see also City of Jacksonville, 896 F.2d at 1285–86 (noting that an ongoing violation of First Amendment rights constitutes irreparable injury).

The Court has concluded that Plaintiff is substantially likely to establish that Defendant's removal of Plaintiff's comments and blocking Plaintiff from the official Facebook page constituted a violation of Plaintiff's First Amendment right to freedom of speech and expression.  Plaintiff contends that he remains blocked from posting, liking and commenting on the official Facebook page, and he has been blocked since December 2019.  [Doc. 35, p. 6].  Based on the substantial likelihood of Plaintiff showing an ongoing violation of his constitutional rights, the Court finds that Plaintiff has also demonstrated a substantial likelihood of irreparable injury absent preliminary injunctive relief.

D.    **Balance of the Equities and Public Interest**

The Court will analyze the final two factors together:  damage to the opposing party and the public interest.  Analyzing these factors together is appropriate because Plaintiff alleges constitutional violations by a state actor.  See Swain v. Junior, 958 F.3d 1081, 1091 (11th Cir. 2020) (noting where the government is the party opposing the preliminary injunction, its interest and damage merge with the public interest).

Plaintiff contends that protection of free speech rights is always in the public interest and that preliminary relief is essential to safeguard his constitutional rights during the pendency of these proceedings.  [Doc. 35, pp. 21–22].  The risk of damage to Defendant is minimal, Plaintiff argues, because an injunction would simply require Defendant to comply with her First Amendment obligations.  Id. at 22.  On the other hand, Defendant contends that she would be damaged by a preliminary injunction because the official Facebook page would be subjected to a flood of internet spam, thus damaging Defendant's ability to communicate with her constituents and the public in the way that she deems best.  [Doc. 37, pp. 23–24].

After applying the facts to the remaining factors, the Court finds that the balance of equities weighs in favor of Plaintiff.  Granting injunctive relief to cease an ongoing infringement of Plaintiff's constitutional right to freedom of speech and

expression outweighs Defendant's desire to exclude opposing public viewpoints from the official Facebook page, especially considering that Defendant has alternative options to communicate her message within constitutional boundaries, such as disabling public comments or responses on her posts altogether.  Further, the Eleventh Circuit has made clear that "the public interest is always served in promoting First Amendment values," Suntrust Bank v. Houghton Mifflin Co., 268 F.3d 1257, 1276 (11th Cir. 2001), whereas the public has no interest in unconstitutional government action, see KH Outdoor, LLC v. City of Trussville, 458 F.3d 1261, 1272 (11th Cir. 2006).  Therefore, Plaintiff has adequately demonstrated that the threatened injury to Plaintiff outweighs any damage that the proposed injunction may cause to Defendant, and that the injunction, if issued, would not be adverse to the public interest.

Accordingly, Plaintiff has satisfied all requirements for a preliminary injunction.

## CONCLUSION

Plaintiff's Motion for Preliminary Injunction [Doc. 2] is **DENIED** as moot, and Plaintiff's Second Brief in Support of Preliminary Injunction [Doc. 35] is **GRANTED**.  The Court hereby **ORDERS** Defendant to cease unconstitutional viewpoint-based blocking and removal of Plaintiff's expressive activity on the

official Facebook page and to rescind her ban on Plaintiff's access to the official Facebook page.

Because the preliminary injunction is decided and discovery is stayed due to the parties' desire to conserve resources in reaching a resolution, the Court **ORDERS** the case to mediation.  The parties may retain a private mediator at their own expense or ask the Court to appoint a United States Magistrate Judge to conduct the mediation.  The parties are not required to pay for mediation by a Magistrate Judge.  No later than March 14, 2023, the parties must advise the Court of their mediation preference.  The parties shall have through and including April 21, 2023, to complete the mediation.

In light of the upcoming mediation, the Clerk is **DIRECTED** to **ADMINISTRATIVELY CLOSE** this case for docket management purposes.  Administrative closure will not prejudice the rights of the parties to this litigation in any manner nor preclude the filing of documents.  Within five days after the mediation, the parties shall notify the Court as to whether mediation was successful.  If mediation fails to result in a resolution, the Court will reopen the case.

**SO ORDERED** this 7th day of March, 2023.

**J. P. BOULEE**
United States District Judge